**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DANIEL KEATING,** | : | |
| **Plaintiff,** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **EQUISOFT, INC., et al.** | : | |
| **Defendants.** | : | **NO. 11-0518** |

**MEMORANDUM**

PRATTER, J.                                                     AUGUST 21ST, 2014


**I.      FACTUAL BACKGROUND[1]**

Daniel Keating, a resident of New York, is a management consultant and software expert, and principal of The Keating Consulting Group, Inc. Mr. Keating previously worked for Oracle, and thus has experience with Oracle's Insurance Policy Administration System (IPAS), a software enterprise suite product used by insurance companies that supports policy issuance, processing, billing, collections, and claims.

After Mr. Keating was terminated from his employment at Oracle, Defendant EquiSoft Inc. ("EquiSoft") hired Mr. Keating in November 2009. EquiSoft is a Canadian enterprise software integration firm. EquiSoft's life insurance division, which is located in Ambler, Pennsylvania, provides the integration and installation of IPAS for the life insurance industry. Specifically, Mr. Keating was hired to use his contacts as a former employee of Oracle to hire other Oracle employees to help EquiSoft build and staff its IPAS department.

---

[1] The facts are undisputed unless expressly noted. Where there is a factual dispute, as long as the non-moving party has record support for its position, the facts are viewed in the light most favorable to it.

On November 24, 2009, Mr. Keating entered into a contract with EquiSoft for consulting services for a term of 90 days, terminable by either party at any time, with 30 days written notice. While the consulting agreement was for a short term, Mr. Keating discussed with EquiSoft's top management the possibility of his continuing as an EquiSoft employee at the end of the consulting agreement. Mr. Keating also signed EquiSoft's standard Non-Solicitation Agreement, Confidentiality Agreement, and Intellectual Property Agreement.  In the Non-Solicitation Agreement, Mr. Keating promised, until one year after the end of his engagement with EquiSoft, "not to solicit the customers of the company, other than in the execution of his/her functions on behalf of the company." Defs.' Motion for Summary Judgment ("MSJ") Ex. 4. Additionally, these Agreements provide that they "shall be interpreted in accordance and governed in all respects by the laws of the Commonwealth of Pennsylvania." *Id.*

In late November, shortly after Mr. Keating began working for EquiSoft, he was contacted by IHS Professional Services, Inc., a headhunting firm, about a senior level position it was seeking to fill for an unidentified client.  After sending his resume to IHS, Mr. Keating learned that the position was with Capgemini Financial Services USA, Inc. ("Capgemini"). Capgemini is a large management consulting and IT service firm, with over 100,000 employees in 36 countries.  Capgemini was one of EquiSoft's life insurance division's largest clients, and it frequently subcontracted with EquiSoft to perform IPAS related work. One of the main roles of the position at Capgemini that Mr. Keating was interviewed for was to grow their internal IPAS practice. During the same time period Mr. Keating was interviewing with Capgemini, Capgemini and EquiSoft were negotiating for Capgemini's potential acquisition of EquiSoft.

After a hiring process that involved multiple interviews, Mr. Keating was offered a permanent position at Capgemini.  Mr. Keating entered into an at will employment agreement

with Capgemini on January 14, 2010,  to be Capgemini's global practice manager for its IPAS

practice. Mr. Keating was to work out of his home office in New York and whatever various

locations they needed him to see clients, meet with co-workers, and attend meetings.

On January 15, 2010, at EquiSoft's Pennsylvania office, Mr. Keating informed Mr.

McCahill that he had accepted a job at Capgemini. According to Mr. Keating, this meeting was

cordial. However, subsequent to their meeting, Bill O'Donnell, EquiSoft's then General Manger

for the Philadelphia operations, and EquiSoft's Vice President, Steve Michaud, reviewed copies

of the contracts Mr. Keating had signed upon starting his employment with EquiSoft.

Additionally, Mr. O'Donnell and Mr. Michaud reviewed agreements they had made with

Capgemini. These "Contractor Agreements" provided that "each party and its Affiliates agree

not to offer employment to or hire any individual who, to the knowledge of the hiring party as of

the date of such offer or employment, is then a technical, sales or managerial employee of the

other party or its affiliates, without the prior written consent of such other party." MSJ Ex. 4.

That same day, Mr. O'Donnell called Capgemini's Global Practice Head Kenneth Coppins and

stated that they were upset that Capgemini had hired Mr. Keating and that they believed it

violated the Contractor Agreement. Nevertheless, Mr. Keating began working for Capgemini on

January 21, 2010.

On January 26, 2010, EquiSoft and Capgemini management held a meeting in Illinois to

discuss the relationship between the two companies. The meeting included Mr. McCahill and

Mr. Romero of EquiSoft, and from Capgemini, Global Practice Head Kenneth Coppins, Vice

President John Barr, and Insurance Vice President Jack Dugan.  At some point during this

meeting, Mr. McCahill and Mr. Romero conveyed to the Capgemini employees that they were

upset that Capgemini had hired Mr. Keating. Mr. Keating also alleges that during this meeting

Mr. McCahill and Mr. Romero attacked his character and reputation, accused Mr. Keating of stealing EquiSoft candidates, and claiming Mr. Keating was unqualified for his new position at Capgemini. Defendants deny that they made any of these statements. In addition, Mr. Keating alleges that Mr. Romero told Capgemini that if they did not terminate Mr. Keating, EquiSoft would discontinue its business relationship with Capgemini.

On February 8, 2010, EquiSoft's counsel sent Mr. Keating, with copies to Mr. Barr and Mr. Coppins, a letter stating that Mr. Keating's acceptance of a position with Capgemini was in breach of his contractual obligations. EquiSoft also sent a similar letter to Mr. Coppins and Mr. Barr stating that Capgemini's hiring of Mr. Keating violated Capgemini's Contractor Agreements with EquiSoft.

On February 16, 2010, Capgemini terminated Mr. Keating's employment. Essentially Capgemini, and Mr. Coppins specifically, terminated Mr. Keating because he believed his hiring would harm Capgemini's relationship with EquiSoft.

Thus, Mr. Keating brought claims for tortious interference with contractual relations (Count I); tortious interference with prospective economic advantage (Count II); defamation/slander (Count III); defamation/libel (Count IV); prima facie tort (Count V); and intentional infliction of emotional distress (Count VI)[2].

## II.    LEGAL STANDARD

Upon motion of a party, summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party moving for summary judgment has the initial burden of supporting its motion by reference to admissible evidence showing the absence of a

---

[2]    In Mr. Keating's opposition brief, he stipulates that he is no longer pursuing his claim for intentional infliction of emotional distress. Keating Br. 1. Accordingly, the Court concludes that Defendant's Motion for Summary Judgment as to Count VI is granted as being unopposed.

genuine dispute of a material fact or showing that there is insufficient admissible evidence to support the fact. *Id.* 56(c). Once this burden has been met, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006).

Summary judgment should be granted only if the moving party persuades the district court that "there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party." *Miller v. Ind. Hosp.*, 843 F.2d 139, 143 (3d Cir.1988). A fact is "material" if it could affect the outcome of the suit, given the applicable substantive law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" if the evidence presented "is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a summary judgment motion, a court "must view the facts in the light most favorable to the non-moving party," and make every reasonable inference in that party's favor. *Hugh v. Butler Cnty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005). The court must not weigh the evidence or make credibility determinations. *Boyle v. County of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998). Nevertheless, the party opposing summary judgment must support each essential element of his or her opposition with concrete evidence in the record. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted). Of course, the court may grant summary judgment if the plaintiff's version of the facts, as a matter of law, does not entitle her to relief: "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and internal quotation marks omitted).

## III.   DISCUSSION

### A.  Mr. Keating's Slander Claim

Mr. Keating alleges that Defendants Mr. McCahill and Mr. Romero are liable for slander based on statements they made about Mr. Keating to Capgemini employees. The parties have not asserted any conflict between the laws of Pennsylvania and New York for a claim for slander and the Court does not find one. Thus, because no real conflict exists between the laws of Pennsylvania and New York, a choice of law analysis is unnecessary. *Hammersmith v. TIG Ins. Co.*, 480 F.3d 230, 231 (3d Cir. 2007). "In turn, as a district court sitting in diversity, we may 'refer interchangeably to the laws of the states whose laws potentially apply,' or rely solely on forum law." *Estate of O'Loughlin ex rel. O'Loughlin v. Hunger*, No. 07-1860, 2009 WL 1084198, *3 (E.D. Pa. Apr. 21, 2009) (quoting *Huber v. Taylor*, 469 F.3d 67, 74 (3d Cir. 2006)).

As to Mr. Keating's slander claim, the Defendants argue that it fails as a matter of law because he has put forth no evidence capable of admission at trial that Defendants made the alleged defamatory statements. "Generally, inadmissible evidence can be considered on summary judgment so long as it is capable of being presented in an admissible form at trial." *Wooleyhan v. Cape Henlopen Sch. Dist.*, No. 10-153, 2011 WL 1875710, *23 (D. Del. May 17, 2011) (citing *Petruzzi's IGA Supermarkets, Inc. v. Darling–Delaware Co.*, 998 F.2d 1224, 1234 n. 9 (3d Cir. 1993); *J.F. Feeser, Inc. v. Serv–a–Portion, Inc.*, 909 F.2d 1524, 1542 (3d Cir.1990)). However, "for a defamation claim, the plaintiff must be able to introduce at trial the testimony of the person who directly heard the statement." *Id. See also Burch v. WDAS AM/FM*, No. 00–4852, 2002 WL 1471703, at *13 (E.D. Pa. June 28, 2002). Thus, "the testimony of a

person who received notice of the defamatory statement from another is not sufficient. Further, summary judgment is appropriate if the witness who directly heard the defamatory statement disavows hearing it before trial." *Id.* (citing Nichols v. Bennett Protective & Detective Agency, Inc., 245 F. App'x 224, 228 n. 3 (3d Cir. 2007).

As detailed previously in the factual background, Mr. Keating alleges that Mr. McCahill and Mr. Romero made the defamatory statements at the January 26, 2010, meeting with Capgemini management in Illinois. The Capgemini employees who attended the meeting were Kenneth Coppins, John Barr, and Jack Dugan. Mr. Keating alleges that during this meeting Mr. McCahill and Mr. Romero attacked his character and reputation. Mr. Keating contends that Mr. McCahill and Mr. Romero of EquiSoft made six defamatory statements during this meeting, specifically that Mr. Keating: (1) was "unqualified for the position he was hired to perform at Capgemini"; (2) "misrepresented himself to Capgemini"; (3) "intended to steal candidates EquiSoft was intending to hire"; (4) "sold Capgemini a bill of goods"; (5) had no expertise with the IPAS system"; and (6) "was not who he says he is." Compl. ¶ 17. None of the Capgemini employees present at the meeting stated that they remember Mr. McCahill or Mr. Romero making any of the six defamatory statements. Additionally, Mr. McCahill and Mr. Romero deny making the alleged slanderous statements. MSJ Ex. 6, McCahill Dep. 54:16-57:24; MSJ Ex. 10, Romero Dep. 71:14-72:20; 107:2-109:1, 114:3-12. Thus, Mr. Keating will not be able "to introduce at trial the testimony of the person who directly heard the statement" and he has not adequately supported his claim to survive summary judgment.

In arguing against Defendants' motion for summary judgment as to his slander claim, Mr. Keating points to his own deposition testimony and the deposition testimony of Mr. Boyce, the executive recruiter, as evidence that Defendants made the slanderous statements. However,

neither Mr. Keating nor Mr. Boyce, were present at the January 26, 2010 meeting. Thus, their deposition testimony is double hearsay and would not be capable of admission at trial.

Mr. Keating also points to Mr. Coppins's deposition testimony to support his slander claim regarding the allegation that Mr. McCahill or Mr. Romero stated that "Mr. Keating was intending to steal candidates EquiSoft was intending to hire." After reading the deposition testimony in context, the Court agrees with the Defendants that Mr. Coppins explicitly denied recalling Mr. McCahill or Mr. Romero stating that Mr. Keating "intended to steal candidates." And, Mr. Coppins's statement that there was some discussion regarding Mr. Keating's proprietary knowledge, is not clear enough testimony to support Mr. Keating's assertion that the Defendants stated he intended to "steal" candidates.[3]

---

[3]    The full deposition testimony is as follows:

Q: Mr. Keating alleges that Mr. McCahill or Mr. Romero stated at that meeting that Mr. Keating "intended to steal candidates EquiSoft was intending to hire." Did either Mr. McCahill or Mr. Romero say those words?

A: I believe that was in reference to my testimony about the proprietary knowledge that Mr. Keating had and why Mr. McCahill was so upset. I did not specifically know what his assignment with EquiSoft was. From my interpretation, it had something to do with search and recruiting for knowledgeable IPAS individuals in the marketplace is all I could infer. And if that is what  that's referring to, then there was dialogue around that.

Q: Okay. What I am referring to here—this is from Mr. Keating, who wasn't at the meeting. So let me just ask it this way: What—what did you recall about Mr. Romero or Mr. McCahill saying that related to proprietary information or candidates of EquiSoft?

A: Can't recall who specifically said, but the gist of the dialogue that day was the work that Mr. Keating was performing for EquiSoft had to do with the identification of knowledgeable quantifiable resources, that they believed that the work was proprietary, and that kind of knew where all the resources were located, and that—and they believed that to have been proprietary information. That's

Additionally, Mr. Keating points to the deposition testimony of Mr. Barr—a Capgemini employee also present at the January 26, 2010 meeting. When Mr. Barr was shown Mr. Keating's six specific allegations detailed above and asked whether he recalled any of those statements Mr. Barr responded as follows:

> It—it I don't recall these phrases specifically, and I don't recall the conversation, maybe I was not attending in this part of the conversation. I was certainly in the room subsequently where we were talking about the relationship between Capgemini and EquiSoft. And there were, as I said, comments at that point that alluded to these kinds of views, if you will.

(Ex. 3 Barr Dep. 121:3-11). This statement is not enough to create a question of material fact to preclude the denial of summary judgment. Although Mr. Barr states that there were "comments at that point that alluded to these kinds of views" he had previously explicitly denied hearing the slanderous statements and even stated that there were portions of time he was not in the meeting. It is Mr. Keating's burden to establish that specific statements were made and this vague and generally unsupportive deposition testimony does not meet that burden.

The closest Mr. Keating comes to supporting his claim for slander is Mr. Dugan's testimony, another Capgemini employee present at the January 26, 2010 meeting. When asked whether he recalled any of the six specific slanderous statements, Mr. Dugan denied recalling them except for the statement that Mr. Keating was unqualified. The discussion surrounding Mr. Dugan's recollection of whether or not Mr. McCahill or Mr. Romero stated that Mr. Keating was unqualified is as follows.

> what I—that's what I recall in terms of—when I said Mr. McCahill became upset with his hiring to Capgemini that—that was discussed.
>
> Q. Do you recall wither Mr. McCahill or Mr. Romero saying that—they believed Mr. Keating "intended to steal" anything?
>
> A. "I can't recall what those words—I—I don't recall.

MSJ Ex. 2, Coppins Dep. 44:9- 46:3.

Q. Mr. Keating alleges that Mr. McCahill and Mr. Romero claim that Keating was, quote "unqualified for the position he was hired to perform at Capgemini," end quote. Is that true?
A. Yes. Again the spirit—there was a statement that Dan would not be the best fit for the role as they understood it.
Q. Do you recall them saying that he was unqualified or do you recall—
A. No, I think it was more—again my recollection is more on fit.

MSJ Ex. 15, Dugan Dep. 26:11-21. (Ex 15 Dugan Dep. 26:11-21). Thus, Mr. Keating has at least produced evidence that Defendants stated he was not a good fit for the company. However, Defendants statement that he was unqualified or that he was not a good fit, are not defamatory. "Only statements of fact, not expressions of opinion, may be defamatory in nature." *Kerrigan v. Otsuka Am. Pharm., Inc.*, 560 F. App'x 162, 167-68 (3d Cir. 2014) (citing *Constantino v. Univ. of Pittsburgh*, 766 A.2d 1265, 1270 (Pa. Super. Ct. 2001) (internal quotation marks omitted). And "[w]hether a statement constitutes a fact or opinion is a legal question resolved by the court." *Id.* "In this inquiry, courts distinguish between 'pure' expressions of opinion and 'mixed' statements that involve opinion and fact." *Id. (Citing Braig v. Field Commc'ns*, 310 Pa. Super. Ct. 569, 456 A.2d 1366, 1373 (1983). "The simple expression of opinion . . . expresses a comment as to the plaintiff's conduct, qualifications or character." *Id.* (citing Restatement (Second) of Torts § 566.) "In contrast, the mixed statement gives rise to the inference that there are undisclosed facts that justify the forming of the opinion expressed by the defendant." *Id.* (Internal quotation marks omitted) (emphasis added). Here, the statements that Mr. Keating was unqualified or was not a good fit are clearly opinions about Mr. Keating's work and competence and thus cannot establish a claim for defamation. *See id.* (Explaining that statements that employee "lacked insight, had poor business acumen, and placed the company at risk" were business opinions and thus were not defamatory.) Accordingly, Mr. Keating's claim for slander fails as a matter of law.

**B.  Mr. Keating's Libel Claim**

Mr. Keating's libel claim stems for the two letters the Defendants' attorney, Bernard Syncott, sent to Mr. Keating, Mr. Coppins, and Mr. Barr, on February 8, 2010. Both letters discussed EquiSoft's legal opinion that Mr. Keating's employment with Capgemini violated his contractual obligations.

Defendants assert that Mr. Keating's libel claim cannot survive summary judgment under both Pennsylvania and New York law. The Court agrees with Defendants, and, thus, a choice of law's analysis is unnecessary. The elements for a libel claim are similar under Pennsylvania and New York law. *See Celle v. Filipino Reporter Enterprises Inc.*, 209 F.3d 163, 176 (2d Cir. 2000); *Franklin Prescriptions, Inc. v. The New York Times Co.*, 267 F. Supp. 2d 425, 433 (E.D. Pa. 2003). Additionally, both New York and Pennsylvania apply libel per se in specific categories so that a Plaintiff is not required to prove special harm, i.e., pecuniary loss. Additionally, both Pennsylvania and New York apply libel per se when the statement would adversely affect the plaintiff in his lawful business/profession. *See Bakare v. Pinnacle Health Hospitals, Inc.*, 469 F. Supp. 2d 272, 298 (M.D. Pa. 2006); *Lian v. Sedgwick James of New York, Inc.*, 992 F. Supp. 644, 649 (S.D.N.Y. 1998). However, in Pennsylvania, even in cases of defamation per se, a plaintiff "must prove general damages from a defamatory publication and cannot rely upon presumed damages." *Rentzell v. Dollar Tree Stores, Inc.*, No. 10-4270, 2012 WL 707005, *4 (E.D. Pa. Mar. 5, 2012*); see also Walker v. Grand Cent. Sanitation, Inc.*, 430 Pa. Super. Ct. 236, 634 A.2d 237, 242 (Pa. Super. Ct. 1993) (explaining that Pennsylvania law will not apply presumed damages and Plaintiff must prove general damages to reputation)).

In this case Mr. Keating has not pointed to any evidence in the record that the February 8, 2010 letters Defendants sent to Mr. Keating, Mr. Coppins, and Mr. Barr, in any way harmed

his reputation or caused him any other harm. The only third parties to receive the February 8, 2010 letters were Mr. Barr and Mr. Coppins. Specifically, one of the February 8, 2010, letters was directly addressed to Mr. Barr and Mr. Barr was copied on the other February 8, 2010 letter that was addressed to Mr. Keating. Mr. Coppins was copied on both letters. Mr. Barr testified that he did not receive the letters until months after Mr. Keating had been terminated by Capgemini and that the letters did not change Mr. Barr's opinion of Mr. Keating. MSJ Ex. 3, Barr Dep. 57:10-60:16. Additionally, in his deposition, Mr. Coppins testified that he could not recall receiving either letter, and that his opinion of Mr. Keating was not changed by any letter that was sent by EquiSoft. MSJ Ex. 2, Coppins Dep. 61:18-63:20. Finally, when asked in his deposition whether he had any proof that the letter affected his reputation, Mr. Keating responded, "I don't know." MSJ Ex. 12, Keating Dep. 27:11-24. Additionally, Mr. Keating fails to point to any other evidence that the letters cause him harm of any sort. Thus, because the two third parties who received the letters specifically stated that their opinion of Mr. Keating was not changed by the letters, and Mr. Keating cannot show that the letters damaged him in any way, his claim fails as a matter of law. *See Donaldson v. Informatica Corp.*, No. 08-605, 2009 WL 4348819, *17 (W.D. Pa. Nov. 30, 2009) (stating that plaintiff did not establish defamation per se claim because did not prove harm to reputation.); *Synygy, Inc. v. Scott–Levin, Inc.*, 51 F.Supp.2d 570, 581-82 (E.D. Pa. 1999) (same).

Although New York law does not appear to require a showing of reputational harm[4], Mr. Keating's libel claim still fails under New York law. Specifically, Mr. Keating's libel claim fails because the statements are not defamatory as they are opinion. "Whether a particular statement

---

[4]     For example, in *Celle v. Filipino Reporter Enterprises Inc.*, 209 F.3d 163, 179 (2d Cir. 2000), the Second Circuit Court of Appeals stated that "[e]ven where the plaintiff can show no actual damages at all, a plaintiff who has otherwise shown defamation may recover at least nominal damages."

constitutes an opinion or an objective fact is a question of law." *Mann v. Abel*, 10 N.Y.3d 271,

276, 885 N.E.2d 884, 885-86 (2008) (internal citations omitted.) "Expressions of opinion, as

opposed to assertions of fact, are deemed privileged and, no matter how offensive, cannot be the

subject of an action for defamation." *Id.* Under New York law, Courts analyze the following

factors to determine whether a statement is fact or opinion:

> (1) whether the specific language in issue has a precise meaning which is readily
>
> understood; (2) whether the statements are capable of being proven true or false;
>
> and (3) whether either the full context of the communication in which the
>
> statement appears or the broader social context and surrounding circumstances are
>
> such as to signal . . .  readers or listeners that what is being read or heard is likely
>
> to be opinion, not fact.

*Id.*

In the February 8, 2010, letter directly addressed to Mr. Barr at Capgemini it stated

"[g]iven the nature of the duties Mr. Keating performed at EquiSoft, you cannot be unaware that

hiring Mr. Keating is a flagrant breach of the agreement he contracted in favour of our client on

November 16, 2009." MSJ Ex. 4.The letter also explained the nature of Mr. Keating's

employment with EquiSoft and detailed the contracts he had signed with EquiSoft. *Id.* In the

letter addressed to Mr. Keating from Mr. Syncott and copied to Mr. Barr and Mr. Coppins it

stated "Our client was recently informed that you had accepted a job with Capgemini or one of

its Affiliates. Your acceptance of this job is a flagrant breach of your contractual obligations." *Id.*

Similar to the letter addressed to Mr. Barr, the letter addressed to Mr. Keating also discussed Mr.

Keating's employment with EquiSoft and the agreements he signed while at EquiSoft. The Court

agrees with EquiSoft that a reasonable reader such as Mr. Barr and Mr. Coppins would find these

statements to be opinion, and not fact. The letters were from Mr. Syncott, EquiSoft's attorney and, accordingly, Mr. Barr and Mr. Coppins would clearly interpret the statement that Mr. Keating breached his agreement as a legal opinion regarding the effect of Mr. Keating's actions with respect to accepting a job at Capgemini when he had previously signed agreements with EquiSoft. *See Lenz v. Young*, 492 F. App'x 145, 147 (2d Cir. 2012) (affirming the district court's grant of summary judgment to defamation claim because attorney's statements about a lawsuit could only be understood as the attorney's opinion about how the case would proceed.) *See also Titan Capital Grp. II, LLC v. Raghavan*, 19 Misc. 3d 1115(A), 862 N.Y.S.2d 818 (Sup. Ct. 2008) (explaining that statement from previous employer to current employer that employee violated their contract by working for current employer was opinion and not defamatory.) Accordingly, because Mr. Keating has not established reputation harm, and because under New York law the statements in the letters were not defamatory, summary judgment will be granted to Defendants as to Mr. Keating's libel claim.

### C.  Mr. Keating's Claim for Prima Facie Tort

Defendants assert that Mr. Keating's claim for prima facie tort contained in Count V fails as matter of law under either Pennsylvania or New York law. The Court agrees with Defendants, and, thus, a choice of law's analysis is unnecessary.

Defendants assert that Pennsylvania law does not recognize a prima facie or "intentional" tort. While Mr. Keating points to a district court case allowing a prima facie tort claim to survive a motion to dismiss, *see Devon IT, Inc. v. IBM Corp.*, 805 F. Supp. 2d 110, 131 (E.D. Pa. 2011), "neither the Pennsylvania Supreme Court nor any other court interpreting Pennsylvania law has recognized an independent claim for intentional tort." *Cotner v. Yoxheimer*, No. 07-1566, 2008 WL 2680872, *7 (M.D. Pa. July 2, 2008) (citing *Marshall v. Fenstermacher*, 388 F. Supp. 2d

14

536, 558 (E.D. Pa. 2005); *D'Errico v. DeFazio*, 763 A.2d 424, 433 (Pa. Super. Ct. 2000)). *See also Hayes v. Waddell & Reed, Inc.*, No. 12-293, 2013 WL 5434139, *8 (W.D. Pa. Sept. 26, 2013). Instead, "the great majority of federal district courts, several of which engaged in a lengthy examination of the issue. . . , have uniformly concluded that the Pennsylvania Supreme Court would not recognize such a cause of action under Pennsylvania law." *Id.* See also, e.g., *Garland v. US Airways, Inc.*, No. 05-140, 2006 WL 2927271, at *4 (W.D. Pa. Oct. 11, 2006); *Marshall*, 388 F. Supp. at 558; *Internet Billions Domain v. Venetian Casino Resort*, LLC, 2002 WL 1610032, at *1-2 (E.D. Pa. May 31, 2002); *Charles Shaid of Pennsylvania, Inc. v. George Hyman Const. Co.*, 947 F. Supp. 844, 855 (E.D. Pa. 1996). The Court agrees with the vast majority of courts determining this issue and concludes that intentional tort is not a cognizable legal theory in Pennsylvania.

Additionally, if the Court were to apply New York law, Mr. Keating's claim for prima facie tort also fails as a matter of law. Under New York Law "[t]o prevail on a prima facie tort claim, a plaintiff must plead that the *only* motivation for the act was 'disinterested malevolence.' It is well established that a plaintiff cannot recover unless a defendant's conduct was not only harmful, but done with the sole intent to harm." *Margrabe v. Sexter & Warmflash, P.C.*, 353 F. App'x 547, 549 (2d Cir. 2009) (citing *Twin Labs., Inc. v. Weider Health & Fitness*, 900 F.2d 566, 571 (2d Cir. 1990). Additionally, the Second Circuit Court of Appeals has held that "motives other than disinterested malevolence, 'such as profit, self-interest, or business advantage' will defeat a prima facie tort claim." *Id.* (quoting *Twin Labs., Inc.*, 900 F.2d at 571.) In this case, Mr. Keating does not dispute that one of the reasons Defendants interfered with his employment with Capgemini was because EquiSoft was involved in negotiations to be purchased by Capgemini, which would result in a large financial gain for the Defendants. *See* Keating Br.

18.  Defendants were concerned that Mr. Keating's employment with Capgemini would disrupt this business deal because Mr. Keating would be able to successfully grow Capgemini's internal IPAS capabilities. Defendants believed that hiring Mr. Keating was not in the spirit of the acquisition negotiations. Thus, because Defendants clearly had at least monetary motives for their actions, their motivations were not only disinterested malevolence, and Mr. Keating's claim fails under New York law. Accordingly, the Court will grant Defendants' motion as to Mr. Keating's claim for prima facie tort contained in Count V.

### D.  Mr. Keating's Claims for Tortious Interference with Contractual Relations and Tortious Interference with Prospective Economic Advantage

For Mr. Keating's claims for tortious interference contained in Counts I and II, Mr. Keating asserts that Pennsylvania law applies while EquiSoft contends that New York law applies. Unlike the above claims, the Court concludes that it must determine which law to apply to this case because an actual conflict exists.[5] A federal court sitting in a diversity case applies

---

[5]      The Court rejects Mr. Keating's argument that Pennsylvania law applies based on the choice of law clause contained in the Non-Solicitation Agreement, the Intellectual Property Agreement, and the Confidentiality Agreement Mr. Keating signed. Specifically, each agreement states that "the agreement shall be interpreted in accordance with and governed in all respects by the laws of the Commonwealth of Pennsylvania." Keating Br. 9. This choice of law provision may well have been dispositive as to the law to be applied if the case involved a breach of contract claim. However, this action involves tort claims that are independent of the contracts between EquiSoft and Mr. Keating. Specifically, courts have stated that contractual choice of law provisions "do not govern tort claims between contracting parties unless the fair import of the provision embraces all aspects of the legal relationships." *Jiffy Lube Int'l, Inc. v. Jiffy Lube of Pa., Inc.*, 848 F. Supp. 569, 576 (E.D. Pa. 1994). *See also Kirschbaum v. WRGSB Assocs.*, 243 F.3d 145, 151 (3d Cir. 2001) (tort claim governed not governed by choice of law provision even though related contract claim governed by Illinois law pursuant to choice of law provision); *Leopold Graphics, Inc. v. CIT Grp./Equip. Fin., Inc.*, No. 01-6028, 2002 WL 1397449, *3 n.1 (E.D. Pa. June 26, 2002) (explaining that contractual choice of law provisions did not govern tort claims).  Mr. Keating relies on *Seltzer v. Dunkin' Donuts, Inc.*, No. 09-5484, 2011 WL 1532398, * 5 (E.D. Pa. Apr. 21, 2011) to show that a contractual choice of law provision may apply to claims arising in tort. However, the choice of law provision in *Seltzer* was much broader than the provision in this case. Specifically, the choice of law provision in *Seltzer* stated  "the resolution of all disputes between the parties bound hereunder, whether in tort . . . or whether arising out of or relating to the parties' contractual relationship, shall be governed by the law of the

the conflict laws of the state in which it sits. *Assicurazioni Generali*, S.P.A. v. Clover, 195 F.3d

161, 164 (3d Cir.1999) (citing *Shuder v. McDonald's Corp.*, 859 F.2d 266, 269 (3d Cir. 1988)).

Accordingly, the Court must apply Pennsylvania's choice-of-law rules. The Third Circuit Court

of Appeals has recently described Pennsylvania's choice-of-law rules as detailed below.

> Pennsylvania applies the . . . flexible, interests/contacts' methodology to contract choice-
>
> of-law questions. . . . [First, the Court] must determine the substance of [the] states' laws,
>
> and look for actual, relevant differences between them. If the two jurisdictions' laws are
>
> the same, then there is no conflict at all, and a choice of law analysis is unnecessary. If
>
> there are actual, relevant differences between the laws, then [the Court] examine[s] the
>
> governmental policies underlying each law, and classify the conflict as a "true," "false,"
>
> or an "unprovided-for" situation.

*Pac. Employers Ins. Co. v. Global Reinsurance Corp. of Am.*, 693 F.3d 417, 432 (3d Cir. 2012)

(Internal quotation marks, citations, and alterations omitted). Where a "false" conflict the Court's

inquiry is at an end and the law of the forum applies. *Mzamane v. Winfrey*, 693 F. Supp. 2d 442,

467-68 (E.D. Pa. 2010). In an "unprovided-for" situation, lex loci delicti (the law of the place of

the wrong/injury) governs. *Budget Rent-A-Car Sys., Inc. v. Chappell*, 407 F.3d 166, 170 (3d Cir.

2005). "If a true conflict exists, the Court must then determine which state has the 'greater

interest in the application of its law.'" *Hammersmith*, 480 F.3d at 231 (quoting *Cipolla v.

Shaposka*, 439 Pa. 563, 267 A.2d 854, 856 (1970). The methodology is "a combination of the

approaches of both the Restatement II (contacts establishing significant relationships) and

interests analysis (qualitative appraisal of the relevant States' policies with respect to the

---

Commonwealth of Massachusetts." *Id.* at n.11. The choice of law provisions in Mr. Keating's
contracts with EquiSoft are clearly limited to "the agreement[s]." Accordingly, the choice of law
provisions do not encompass tort actions and therefore the Court will not automatically apply
Pennsylvania law for Plaintiff's claims and instead must do a conflicts of laws analysis to
determine if Pennsylvania or New York law applies.

controversy)." *Id.* (Internal quotation marks, citations, and alterations omitted). "This analysis

requires more than a mere counting of contacts." *Id.* (Internal quotation marks and citations

omitted). "Rather, [the Court] must weigh the contacts on a qualitative scale according to their

relation to the policies and interests underlying the particular issue." *Id.* (Alterations omitted.)

Under New York law, when a tortious interference claim is premised on at will

employment relationship, the plaintiff must establish that the defendant acted "for a wrongful

purpose or used dishonest, unfair, or improper means to interfere with a business relationship of

some kind. *Kanhoye v. Altana Inc.*, 686 F. Supp. 2d 199, 214 (E.D.N.Y. 2009.)[6] Under

Pennsylvania law there is no such requirement.[7] Because New York has a higher standard for

---

[6]     Defendants contend that New York law does not recognize a claim for tortious
interference with an existing contract based on an at-will employment claim, and instead Mr.
Keating can only assert a tortious interference claim based on his prospective relationship with
Capgemini. While there appears to be some confusion regarding this topic, as will be explained
below, Mr. Keating fails to establish a claim for tortious interference, whether it is interpreted as
being based on an existing contract, or a prospective business relationship.

[7]     Under Pennsylvania law to prevail on a claim for tortious interference with existing or
prospective contractual relationships a party must prove "(1) the existence of a contractual or
prospective contractual or economic relationship between the plaintiff and a third party; (2)
purposeful action by the defendant, specifically intended to harm an existing relationship or
intended to prevent a prospective relation from occurring; (3) the absence of privilege or
justification on the part of the defendant; (4) legal damage to the plaintiff as a result of the
defendant's conduct; and (5) for prospective contracts, a reasonable likelihood that the
relationship would have occurred but for the defendant's interference." *Acumed LLC v. Advanced
Surgical Servs., Inc.*, 561 F.3d 199, 212 (3d Cir. 2009.)
        While Defendants assert in their reply brief that at will employment contract cannot
establish a cause of action for tortious interference with contract under Pennsylvania law the
Court does not agree. In a recent case *Mason v. Range Resources–Appalachia, LLC*, No. 12–369,
2012 WL 2116969, *5-6 (W.D. Pa. May 9, 2012), the district court by a clear and detailed
analysis of the decisions of the Superior Court of Pennsylvania and district courts for the Third
Circuit, predicted that the Supreme Court of Pennsylvania would conclude that a plaintiff may
maintain a cause of action for tortious interference with contract when the contract was based on
existing, at-will employment. *See also Beyda v. USAir, Inc.*, 697 F.Supp. 1394, 1398 (W.D.
Pa.1988)); *Curran v. Children's Service Center of Wyoming County, Inc.*, 396 Pa.Super. 29, 578
A.2d 8, 13 (Pa. Super. Ct.1990). *But see Hennessey v. Santiago*, 708 A.2d 1269, 1278-79 (Pa.
Super. Ct. 1998) (holding that at-will employment cannot establish a claim for tortious
interference with existing contractual relations.)

establishing tortious interference claims, there is an actual conflict between Pennsylvania law and New York law. Thus, the Court must examine the governmental policies underlying each law, and classify the conflict as a "true," "false," or an "unprovided-for" situation.[8] *Pac. Employers Ins. Co.*, 693 F.3d at 432.

In this case Pennsylvania law is beneficial to plaintiffs/employees because it requires less culpable conduct on the part of the defendant. New York law on the other hand, is advantageous to defendants because it requires a plaintiff to show that defendant acted with malice or employed wrongful means. *Finley v. Giacobbe*, 79 F.3d 1285, 1295 (2d Cir. 1996). However, in this case, the Mr. Keating is a New York resident and EquiSoft's life insurance business has its principle place of business in Pennsylvania. Thus, "since the parties are essentially advancing countervailing arguments disfavoring the application of the laws of their respective domiciles, neither jurisdiction has a particularly strong interest in applying its law to the counterclaims." *York Grp., Inc. v. Pontone*, No. 10-1078, 2014 WL 896632, *32 (W.D. Pa. Mar. 6, 2014). In an unprovided for situation *lex loci delicti*—the law of the place of the injury—applies. *See York Grp., Inc.*, 2014 WL 896632, *32 (explaining that in an unprovided for case, the lex loci delicti should govern.) "When the injury sustained is of a pecuniary nature, the plaintiff's principal place of business is generally considered the place of injury. . . ." *CAT Internet Servs., Inc. v. Magazines.com Inc.*, No. 00-2135, 2001 WL 8858, *4 (E.D. Pa. Jan. 4, 2001). In this case, Mr. Keating primarily worked out of his New York office during his tenure with Capgemini and he fails to point to any other location that would become his principal place of business in the

---

[8]        The Court notes that neither party briefed this step of the conflict of laws analysis.

future. MSJ Ex. 12, Keating Dep. 12:22- 13:10. Accordingly, New York law applies in this case.[9]

As detailed previously, under New York law, when a plaintiff's claim for tortious interference with contractual relations or prospective economic advantage is based on defendants' interference with plaintiff's at will employment relationship, a plaintiff must show that defendant acted with malice or employed wrongful means. *Kanhoye*, 686 F. Supp. 2d at 214. "Wrongful means include physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure; they do not, however, include persuasion alone although it is knowingly directed at interference with the contract." *Guard–Life*, 428 N.Y.S.2d 628, 406 N.E.2d at 448; *Carvel Corp.*, 785 N.Y.S.2d 359, 818 N.E.2d at 1102 (explaining that wrongful means "must amount to a crime or an independent tort"). Thus, "Courts are disinclined to find tortious interference with an at-will employment contract unless a former employer can show [] fraudulent or criminal activity. . . ." *Barbagallo v. Marcum LLP*,

---

[9]       Even if there were a true conflict in this case, the outcome would not change. The relevant contacts for actions in tort to determine which state has the greater interest in the application of its law are enumerated in Restatement (Second) of Conflict of Laws § 145(2)(a)-(d), and include: "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered." *Taylor v. Mooney Aircraft Corp.*, 265 F. App'x 87, 91 n.4 (3d Cir. 2008). In this case, Mr. Keating lived in New York during the relevant time period. Additionally, during his work with EquiSoft and Capgemini, Mr. Keating spent the majority of his time working from his home office in New York. The only relevant contact Pennsylvania has with this case is that the EquiSoft life insurance division's principle place of business is in Pennsylvania and one defendant, Thomas McCahill, resides in Pennsylvania. Section 156 of the Restatement applies on this point, stating that "[t]he applicable law [under § 145] will usually be the local law of the state where the injury occurred." *Panthera Rail Car LLC v. Kasgro Rail Corp.*, 985 F. Supp. 2d 677, 700 (W.D. Pa. 2013). And, as explained above "federal courts applying Pennsylvania choice of law rules have recognized that where the injury is pecuniary in nature, the plaintiff's principal place of business is generally considered the place of injury and represents a contact of substantial significance." *Id.* Therefore, as detailed previously, because Mr. Keating primarily worked out of his New York office, Mr. Keating's injury was felt in New York and New York law would apply in this case

820 F. Supp. 2d 429, 444 (E.D.N.Y. 2011) (*citing Carvel Corp.*, 785 N.Y.S.2d 359, 818 N.E.2d at 1102; *Lockheed Martin Corp. v. Aatlas Commerce Inc.*, 283 A.D.2d 801, 725 N.Y.S.2d 722 (3d Dep't 2001).

Mr. Keating argues that Defendants acted solely out of malice by commanding that Capgemini terminate Mr. Keating. However, Defendants offer a legitimate motivation for their actions—in fact they offer numerous motivations. Specifically, Defendants explain that they opposed Capgemini's hiring of Mr. Keating because they believed: (1) it violated their agreements with Mr. Keating and Capgemini; (2) it would reduce Capgemini's reliance on EquiSoft as a subcontractor; and (3) it harmed the potential for Capgemini to acquire EquiSoft.

Mr. Keating generally disputes Defendants' legitimate motivations; however, he fails to create a triable issue of fact as to each motivation. First, as detailed above, in his briefing Mr. Keating does not dispute that one of the reasons Defendants interfered with his employment with Capgemini was because EquiSoft was involved in negotiations to be purchased by Capgemini which would result in a large financial gain for the Defendants. *See* Keating Br. 18. Specifically, Defendants were concerned that Mr. Keating's employment with Capgemini would disrupt this business deal because Mr. Keating's knowledge of the industry and specific people to hire would allow Capgemini to grow its internal IPAS capabilities. Accordingly, Defendants believed that Capgemini's hiring of Mr. Keating harmed their negotiations for a potential acquisition. While, Mr. Keating contends that this reason cannot provide a legitimate reason for their actions, he is incorrect because economic motivation is a legitimate motivation that counsels against a finding of malice. *See Vinas v. Chubb Corp.*, 499 F. Supp. 2d 427, 434 (S.D.N.Y. 2007) (holding that economic motivation established that defendant did not act solely out of malice); *see also A & A Jewellers Ltd. v. Bogarz, Inc.*, 2005 WL 2175164, *2, (W.D.N.Y. 2005) ("Actions taken, at least

in part, to promote or advance [defendant's] economic self-interest are, by definition, not taken for the sole purpose of harming [plaintiff].")

Additionally, Defendants had a legitimate concern that Mr. Keating's skill and expertise would reduce Capgemini's reliance on EquiSoft for future business deals. Mr. Keating disputes this assertion by pointing to Mr. Coppins's statement at his deposition that Capgemini's intent was to "use EquiSoft as- as needed on a go-forward basis." MSJ Ex. 12, Coppins Dep. 26:6-7. However, as Defendants point out, Mr. Coppins also stated that in hiring Mr. Keating, it was Capgemini's intent to "build sufficient capability to serve our clients and—both current and future clients and reduce the dependency on any—on any contractor, including EquiSoft." *Id.* 21: 5-9. Thus, although Mr. Keating has established that Capgemini still intended to use EquiSoft for its business needs, he has not pointed to any evidence that shows that Capgemini did not intend to reduce their reliance on EquiSoft. Hence, Defendants economic interest in maintaining their business is a legitimate motivation, and, establishes that Defendants did not act solely from malice.

Accordingly, Mr. Keating is left to argue that Defendants used wrongful means when it interfered with Mr. Keating's employment at Capgemini. To establish "wrongful means," as a general rule, "the defendant's conduct must amount to a crime or an independent tort . . ." *Vinas*, 499 F. Supp. 2d at 435 (quoting *Masefield AG v. Colonial Oil Indus.*, 05-2231, 2006 WL 346178, *4 (S.D.N.Y. Feb. 15, 2006)). Mr. Keating has not alleged that Defendants' actions constitute a crime, and, as explained above, the Court has determined that Mr. Keating has not established his independent tort claims.

Some courts have stated that "wrongful means" may include "some degrees of economic pressure, if such pressure is extreme and unfair." *Id.* (Internal quotation marks and citations

omitted.)  However, "courts have been stingy in their interpretation of this tort" when determining whether instances of economic pressure constitute "wrongful means." *Darby Trading Inc. v. Shell Int'l Trading & Shipping Co. Ltd.*, 568 F. Supp. 2d 329, 346 (S.D.N.Y. 2008). *See also*, *Vinas*, 499 F. Supp. 2d at 435 (explaining that while defendant "exerted some pressure upon [the third-party] to drop [the plaintiff]" because the pressure alleged by the plaintiff was not "extreme in a manner approaching a separate crime or tort," that he did not prove wrongful means); *Masefield AG*, 2006 WL 346178, at *9 ("It is not clear what 'extreme and unfair' means, and whether economic pressure can be 'extreme and unfair' without being tortious and criminal.") Additionally, Mr. Keating has failed to point out any case where a court concluded that economic pressure constituted "wrongful means." Accordingly, while Defendants did exert pressure on Capgemini, the Court cannot say it was extreme or unfair in a manner similar to a crime or a tort. Thus, Mr. Keating has not established that Defendants' actions are wrongful. Finally, while Defendants did threaten to bring suit against Capgemini, this alone is not enough to constitute "wrongful means." *See Treppel v. Biovail Corp.*, No. 03-3002, 2005 WL 427538, *8 (S.D.N.Y. Feb. 22, 2005) (threat to bring suit against employer not enough to establish "wrongful means" as it was not criminal or tortious conduct.) As Defendants note, Mr. Keating failed to cite evidence that shows that Defendants did not have a good faith belief that the contractor agreements prevented Capgemini from hiring Mr. Keating. Accordingly, because Mr. Keating has not proven that Defendants' were acting solely out of malice, or using wrongful means, his claims for tortious interference contained in Counts I and II fail as a matter of law.

III.     CONCLUSION

Thus, for the foregoing reasons, the Court will grant the Defendants' Motion Summary

Judgment.

An appropriate Order follows.

BY THE COURT:

S/Gene E.K. Pratter
GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE